<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

| | | |
|---|---|---|
| **BRITISH AIRWAYS, PLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:05-11477-GAO** |
| **v.** | ) | |
| | ) | |
| **SIGNATURE FLIGHT SUPPORT** | ) | |
| **CORP., et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

<div align="center">

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

</div>

Defendants ASI, Inc. ("ASI") and Signature Flight Support Corp. ("SFS") hereby move for

partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule

56.1.

<div align="center">

**STATEMENT OF UNDISPUTED FACTS**
**PURSUANT TO LOCAL RULE 56.1**

</div>

1.      On or about June 1, 1993, SFS and British Airways, PLC ("BA") entered into a

standard fuel services contract, denominated "Into-Plane Fuel Service Agreement" ("the Agreement").

See Complaint  9 ( Annexed hereto as Exhibit 1) and Agreement, dated June 1, 1993 annexed thereto

as Exhibit 2 (Annexed hereto as Exhibit A).

2.      The Agreement was in effect on July 13, 2002. Id.

3.      The Agreement includes mutual indemnification provisions as follows:

> Indemnification.  Signature agrees to fully indemnify, save and hold harmless Carrier, the
> Airport and their respective directors, officers, employees, agents and assigns from and
> against all claims and actions, including those arising from and in conjunction with fuel
> spills, and all expenses and fees incidental to the investigation and defense thereof,
> arising out of Signature's acts or omissions, or the acts or omissions of its directors,

officers, employees, agents or assigns in connection with the Services which are the subject of this Agreement, except where such claims or actions arise from the sole negligence or willful misconduct of [BA].

[BA] agrees to fully indemnify, save and hold harmless [Signature,] the Airport and their respective directors, officers, employees, agents and assigns from and against all claims and actions, including those arising from and in conjunction with fuel spills, and all expenses and fees incidental to the investigation and defense thereof, arising out of [Signature's] acts or omissions, or the acts or omissions of its directors, officers, employees, agents or assigns in connection with the Services, except where such claims or actions arise from the sole negligence or willful misconduct of [Signature.]

See Agreement at pp. 6-7, ¶11.

4.       The Agreement contains a provision in bold, capitalized typeface, limiting Signature's

liability to direct damage to aircraft as follows:

THE PARTIES HEREBY AGREE THAT UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE), SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS.  SIGNATURE AGREES TO ASSUME LIABILITY FOR ANY DIRECT DAMAGES CAUSED BY THE SOLE NEGLIGENCE OF ITS EMPLOYEES, DIRECTORS OR OFFICERS.

See Agreement at p.8, ¶13.

5.       On or about May 1, 2002, ASI assumed the responsibilities of SFS for the Agreement.

See Assignment and Consent, (Annexed hereto as Exhibit 3).

6.       On July 13, 2002, BA operated a Boeing B-777 aircraft bearing registration number

GVIIY ("the Aircraft") at Logan International Airport.  See Complaint, ¶¶ 13-14 (Annexed hereto as

Exhibit 1).

7.       On July 13, 2002, a truck operated by ASI struck the Aircraft.  See id. at  ¶¶ 15-18.

2

8.    BA alleges damages for both repairs to the hull and other losses of money because the Aircraft was not usable for some period of time.  See  id. at ¶¶ 21, 23.

9.    The Aircraft was repaired by BA.  See id at  22.

10.   The Agreement includes a choice of law provision stating that the Agreement "shall be governed by and construed in accordance with the laws of the State where the services are performed." See Agreement at p. 8, ¶ 14 (Exhibit A).

### Preliminary Statement

Plaintiff BA claims damages caused by ASI striking its Aircraft.  It seeks not only the direct repair costs to fix the hull, but also consequential damages.  However, the explicit contract wording that BA agreed upon precludes recovery of consequential damages.

BA's claim for damages other than direct repair costs must fail for that reason.  The Court should grant judgment for ASI and SFS on all claims for damages other than the parts and labor required to repair the Aircraft itself. (The cost of parts and labor remains at issue between the parties).

### ARGUMENT

I.    **THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT FOR SFS/ASI AND DISMISS THE CONSEQUENTIAL DAMAGES CLAIM**

A.    **No Genuine Issue Exists as to Any Material Facts.**

The standard for reviewing summary judgment motions is stated in Fed. R. Civ. P. 56(c):

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56; Medeiros v. Vincent, 431 F.3d 25 (1st Cir. 2005); Alliance of Auto Mfrs. v.

Gwadosky, 430 F.3d 73 (1st Cir. 2005); National Nonwovens, Inc. v. Consumer Prods. Enters., 397

F. Supp.2d 245 (D. Mass. 2005).

Once the moving party has carried its burden of establishing the absence of a genuine issue of

material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to

the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986);

Jefferson Ins. Co. v. Roberts, 349 F. Supp.2d 101, 105 (D. Mass. 2004). Thus, the non-moving party

must "make a showing sufficient to establish the existence of every element essential to that party's case,

and on which that party will bear the burden of proof at trial." Matsushita, 475 U.S. at 586. "The mere

existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence

on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 252 (1986). Accord, Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 431 (1st Cir. 2005);

Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000).

Here, the parties agree on all of the material facts. The existence of a contract and the terms of

that contract are not contested. Direct damage to plaintiffs' aircraft occurred. The parties disagree as

to one legal principle--whether the relevant contract requires SFS/ASI to pay consequential damages.

Once resolved, the direct damages issue alone remains.[1]

**B.    The Contract Excludes Consequential Damages**

The interpretation of unambiguous language in a contract is a matter of law for the Court. Fried

---

[1] BA and ASI/SFS disagree as to the fair market rate for the hull repair. This limits the issue to
labor costs.

v. Fried, 5 Mass. App. 660, 662-63, 369 N.E.2d 1222, 1225 (Mass. App. Ct. 1977).[2]  Where the

terms of the contract are unambiguous, the court must enforce the contract according to its terms.

Mejia v. American Cas. Co., 55 Mass. App. 461, 465, 771 N.E.2d 811, 814 (Mass. App. Ct. 2002).

Thus, the court cannot rewrite a contract merely because one might conclude that it would have been

functionally desirable to draft it differently.  See Rogaris v. Alberti, 431 Mass. 833, 835, 730 N.E.2d

869, 871 (2000) (it is not the role of the court to alter the parties' agreement).  Nor may the courts

remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for

the benefit of one party and to the detriment of the other.  See Murphy v. Noonan, 30 Mass. App. 950,

571 N.E.2d 401 (Mass. App. Ct. 1991) (a court may not alter the clear terms of a contract and place

the parties in a position different from that for which they bargained.).  See also National Med. Care,

Inc. v. Zigelbaum, 18 Mass. App. 570, 575-76, 468 N.E.2d 868, 873 (Mass. App. Ct. 1984) (courts

cannot rewrite a contract to cure an oversight or relieve a party from the consequences of failing to

adhere to its plain terms).  A contract must be construed in a reasonable and practical way, consistent

with its language and purpose. Cady v. Marcella, 49 Mass. App. Ct. 334, 729 N.E.2d 1125 (2000).

 Here, the terms of the Agreement unambiguously preclude the recovery of consequential

damages by either party from the other:

> THE PARTIES HEREBY AGREE THAT UNDER NO CIRCUMSTANCES SHALL
> EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL,
> CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, WHETHER IN

---

[2]Here, the parties have contractually agreed that the Agreement shall be governed by and
construed in accordance with the laws of the State where the services are performed.  See Agreement
(Exhibit A) at p. 8, ¶ 14.  Massachusetts courts routinely honor contractual choice of law provisions.
See General Motors Corp. v. Firepond, Inc., 2003 Mass. Super LEXIS 220 (Mass. Super. Ct. 2003).
Accordingly, Massachusetts law governs construction of the Agreement.

CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE), SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS.

See Agreement (Exhibit A) at p.8, ¶13.  The Agreement further provides that Signature assumes liability for direct damages caused solely by its own negligence:

SIGNATURE AGREES TO ASSUME LIABILITY FOR ANY DIRECT DAMAGES CAUSED BY THE SOLE NEGLIGENCE OF ITS EMPLOYEES, DIRECTORS OR OFFICERS.

See id. at p.8, ¶13. Thus, the parties agreed that SFA/ASI would pay only damages, not consequential damages related to any property damage to BA aircraft.  Pursuant to the expressly stated intent of the parties, SFS/ASI is liable only for direct damage to the Aircraft.  This is the only logical reading of the Agreement.

Massachusetts courts have recognized that parties to a contract are free to limit their liability by mutual agreement, unless the provision is unconscionable or violates public policy.  See Chase Commercial Corp. v. Owen, 32 Mass. App. 248, 253-54, 588 N.E.2d 705 (Mass. App. 1992); Harris v. McIntyre, 2000 Mass. Super LEXIS 181 ( Mass. Super. Ct. 2000); Zircon Co. v. Grphik Dimensions, 1996 Mass. Super. LEXIS 227 (Mass. Super. Ct. 1996).  As such, Massachusetts courts routinely enforce contractual provisions which limit liability. See Pupillo v. New England Tel. Co. 381 Mass. 714, 412 N.E.2d 335 (1980); New England Watch Corp. v. Honeywell, Inc., 11 Mass. App. 948, 416 N.E.2d 1010, 1010-11 (Mass. App. Ct. 1981).  See also Harris, 2000 Mass Super LEXIS 181 at *29, citing Canal v. Westinghouse Elec. Corp., 406 Mass. 369, 374-75, 548 N.E.2d 182 (1990) (enforcing a provision excluding consequential damages).

It is well settled that sophisticated business entities who have engaged in a negotiated arms

length transaction are entitled to enforce contractual provisions which limit liability. See id.  See also Northridge Homes, Inc. v. Hohn W. French & Assocs., 1999 Mass. Super. LEXIS 435, *12 (Mass. Super. Ct. 1999) (Massachusetts courts have recognized the right of parties to enforce contractual provisions which limit liability).   BA and SFS are both large and sophisticated corporations, with legal counsel available to them, negotiating terms of the contract.  Moreover, the terms of the Agreement are reasonable in that there is a balance of liability and exposure between the two parties involved. Although SFS is not liable for consequential damages, it is potentially liable for actual physical damage to the Aircraft to the extent such damage was caused by its sole negligence.  See Agreement (Exhibit A) at p.8, ¶13.

Where the words of the contract are clear, they must be construed in their usual and ordinary sense, and the court must enforce the contractual terms as written.  See National Medical Care, 18 Mass. App. at 575, 468 N.E.2d at 873; Cady v. Marcella, 49 Mass. App. 334, 338, 729 N.E.2d 1125, 1129-30 (Mass. App. Ct. 2000).  The word "direct,' in its everyday usage, carries a meaning that refers to damages other than collateral or consequential damages.  Thus, there is no need for the Court to search for the intentions of the parties.

However, even if "direct" is not so clear in meaning, the court must discover the intention of the parties by considering the contractual terms, the surrounding circumstance, and the purpose of the contract.  See Haverhill v. George Brox, Inc. , 47 Mass. App. Ct. 717, 720, 716 N.E.2d 138 ( Mass. App. Ct. 1999).  Courts must interpret the contract as a whole and define the terms in their plain and ordinary meaning.  See Mejia, 55 Mass. App. at 465, 771 N.E.2d at 814-15; Johnson v. Worcester Bus. Devo. Corp., 1 Mass. App. Ct. 527, 302 N.E.2d 575 (Mass. App. Ct. 1973); Lumbermens Mut.

Cas. Co. v. Offices Unltd., 419 Mass. 462, 466, 645 N.E.2d 1165, 1168 (1995).

Two courts have interpreted this wording, as applied to aircraft. Both concluded that the words mean actual and direct physical loss. See Kemple v. Beech Mountain Air Service, Case No. A-C-81-33, 1982 U.S. Dist. LEXIS 14344, *13-14 (W.D.N.C. 1982) (upon loss of aircraft, insurance policy governing "direct loss of a damage" resulted in recovery of only actual cost of aircraft). The second case is well known to BA because its counsel presented the same argument therein on behalf of a different airline. The same position BA takes herein was soundly rejected by the federal district court in New Jersey. See Singapore Airlines v. Signature Flight Support, C.A. No. 01-1999 (DMC) (D. N.J., April 10, 2002) (Order and hearing transcript annexed hereto as Exhibit 4). Despite repeated efforts to paint consequential losses as "direct", the court therein refused to rewrite the contract.

## CONCLUSION

For all the foregoing reasons, the Court should grant partial summary judgment for Defendants ASI and SFS on plaintiff's consequential damages claim and, such other and further relief as the Court finds just and proper.

<div style="margin-left:50%">

Respectfully Submitted,
Defendants, ASI, Inc., and
Signature Flight Support Corp.,
By Their Attorneys,
**DOMBROFF & GILMORE, P.C.**

*/s/ Raymond L. Mariani*
_____
Raymond L. Mariani, Esq.
40 Broad Street, Suite 701
New York, NY 10004
Tel.: (212) 742-8450
Fax:  (212) 742-0160

</div>

**Dated:  January 20, 2006**

8

-- and --

Respectfully Submitted,
Defendants, ASI, Inc., and
Signature Flight Support Corp.,
By Their Attorneys,
**LUSHAN, McCARTHY & GOONAN**

**Dated:  January 20, 2006**

*/s/ Michael Lushan*

_____

Michael Lushan, Esq.
496 Harvard Street
Brookline, MA  02446
Tel:  (617) 739-0700
Fax: (617) 734-5375

57627

9

# <u>EXHIBIT 1</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRITISH AIRWAYS PLC, | ) | **Case No.** |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| vs. | ) | |
| | ) | |
| SIGNATURE FLIGHT SUPPORT | ) | |
| CORPORATION, and its subsidiaries, and | ) | |
| AIRCRAFT SERVICE INTERNATIONAL | ) | |
| GROUP, INC., and its subsidiaries and/or | ) | |
| affiliated companies, | ) | |
| | | |
| Defendants. | | |

-----------------------------------------------------

COMES NOW BRITISH AIRWAYS PLC ("BRITISH AIRWAYS"), as Plaintiff by and through its undersigned attorneys, and for its causes of action against the defendants states as follows:

### PARTIES AND JURISDICTION

1.      Plaintiff BRITISH AIRWAYS is a foreign corporation duly organized and existing under the laws of the United Kingdom of Great Britain and Northern Ireland and has its principal place of business at Harmondsworth, Middlesex, England.

2.      Plaintiff BRITISH AIRWAYS is a foreign air carrier engaged in the international transportation of passengers and cargo for hire and operates flights to and from Logan International Airport in Boston, Massachusetts.

3.    Defendant SIGNATURE FLIGHT SUPPORT CORPORATION and its subsidiaries ("SIGNATURE") is a corporation organized and existing under the laws of Delaware with its principal place of business in Florida.

4.    Defendant SIGNATURE does business in the State of Massachusetts and at all times material hereto performed services at Logan International Airport in Boston, including fueling aircraft operated by BRITISH AIRWAYS.

5.    Defendant AIRCRAFT SERVICE INTERNATIONAL GROUP, INC. and its subsidiaries and/or affiliated companies ("ASIG") is a corporation organized and existing under the laws of Delaware with its principal place of business in Florida.

6.    Defendant ASIG does business in the State of Massachusetts and at all times material hereto performed services at Logan International Airport in Boston, including fueling aircraft operated by BRITISH AIRWAYS.

7.    Diversity jurisdiction exists over this action pursuant to 28 U.S.C. § 1332(a) because plaintiff is a citizen of a foreign state and defendants are citizens of the United States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.    Venue in this Court is proper under 28 U.S.C. § 1391(a) because the defendants have corporate residences in Massachusetts, the events or omissions giving rise to this claim occurred at Logan International Airport in Massachusetts, and defendants are subject to jurisdiction in Massachusetts.

2

## GENERAL ALLEGATIONS

9.    On or about June 1, 1993, plaintiff BRITISH AIRWAYS entered into an "Into-Plane Fuel Service Agreement" ("Agreement") with SIGNATURE, which was in full force and effect on July 13, 2002. *See* Exhibit "A".

10.    Pursuant to the Agreement, SIGNATURE, individually or by or with its subsidiaries, was required to store fuel for BRITISH AIRWAYS and provide into-plane fueling services for aircraft operated by BRITISH AIRWAYS at various airports, including Logan International Airport in Boston, Massachusetts.

11.    Defendant SIGNATURE provided into-plane fueling services for aircraft operated by BRITISH AIRWAYS at Logan International Airport.

12.    Defendant ASIG provided into-plane fueling services for aircraft operated by BRITISH AIRWAYS at Logan International Airport.

13.    Plaintiff BRITISH AIRWAYS is the owner of a Boeing B-777 aircraft, U.K. Reg. No. G-VIIY (the "Aircraft").

14.    On the morning of July 13, 2002, the Aircraft was at Gate No. 7A of Terminal E at Logan Airport preparing for departure to London/Heathrow Airport as BA Flight 238.

15.    On the aforementioned date, at or about 7:45 a.m. EDT, an agent and/or employee of SIGNATURE was driving a hydrant truck, Vehicle Registration MP#0636, (the "Vehicle") and, during the course of aircraft refueling operations, caused it to strike the BRITISH AIRWAYS Aircraft forcefully in the vicinity of the outboard engine cowl of the left hand No. 1 position engine.

16.    The Vehicle involved in the incident was owned or leased by SIGNATURE.

3

17.    On the aforementioned date, at or about 7:45 a.m. EDT, an agent and/or employee of ASIG was driving the Vehicle and, during the course of aircraft refueling operations, caused it to strike the BRITISH AIRWAYS Aircraft forcefully in the vicinity of the outboard engine cowl of the left hand No. 1 position engine.

18.    The Vehicle involved in the incident was owned or leased by ASIG.

19.    The impact resulted in damage to the Aircraft, including a large tear about eighteen inches long stretching from the rear to the forward duct panel on the outboard half of the left engine cowl.

20.    These panels are made of special carbon fiber materials that shield the "D" duct and engine thrust reverser sleeve.

21.    As a result of the damage, BA Flight 238 had to be cancelled and the Aircraft had to be removed from service for several days.

22.    The original engine manufacturer had no repair scheme for such extensive damage. Temporary repairs were made to allow the Aircraft to be ferry flown to London, where techniques were devised for permanent repairs.

23.    As a result of the foregoing, plaintiff BRITISH AIRWAYS sustained monetary damages, including, but not limited to, damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution of value of the Aircraft, loss of use of the Aircraft, lost profits and other damages to be proven at trial and totaling at least Five Hundred Thousand Dollars ($500,000), which plaintiff is entitled to recover with interest.

24.    Defendant SIGNATURE does not dispute liability for the damage sustained to the BRITISH AIRWAYS Aircraft.

4

25.    Defendant AISIG does not dispute liability for the damage sustained to the BRITISH AIRWAYS Aircraft.

### FIRST CLAIM FOR RELIEF AS TO SIGNATURE AND ASIG
#### (Negligence)

26.    Plaintiff BRITISH AIRWAYS repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 25 inclusive of this Complaint with the same force and effect as if herein set forth in full.

27.    At all relevant times, plaintiff BRITISH AIRWAYS was exercising all due care and caution for its own safety and the safety of others.

28.    On July 13, 2002, defendants, individually and/or jointly, caused damage to plaintiff's Aircraft through the negligent acts of their agents and/or employees, including, but not limited to, failing to exercise a reasonable and proper degree of care in the operation of the Vehicle; failing to consider the consequences of operating the Vehicle negligently in the vicinity of the Aircraft; failing to provide adequate supervision; failing to provide adequate training; failing to comply with applicable procedures, rules, regulations and laws; and failing to provide personnel to marshal the vehicle to and from the Aircraft.

29.    As a result of the defendants' negligence, plaintiff's Aircraft sustained damage, necessitating repairs and removal of the Aircraft from service.

30.    As a direct and proximate cause of defendants' negligence, plaintiff BRITISH AIRWAYS has sustained monetary damages of at least Five Hundred Thousand Dollars ($500,000), including damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution in value of the Aircraft, loss of use of the Aircraft, lost

<center>5</center>

profits, and other special damages in an amount to be proven at trial and which plaintiff has a right to recover in this action together with interest.

## SECOND CLAIM FOR RELIEF AS TO SIGNATURE AND ASIG
### (Gross Negligence)

31.    Plaintiff BRITISH AIRWAYS repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 30 inclusive of this Complaint with the same force and effect as if herein set forth in full.

32.    At all relevant times, plaintiff BRITISH AIRWAYS was exercising all due care and caution for its own safety and the safety of others.

33.    On July 13, 2002, defendants, individually and/or jointly, caused damage to plaintiff's Aircraft through the grossly negligent, dangerous, and reckless acts of their agents and employees, who acted with a reckless disregard for the safety of others, including, but not limited to, recklessly operating the Vehicle; recklessly disregarding the known consequences of operating a motorized vehicle unsafely in the vicinity of the Aircraft; recklessly and knowingly failing to provide adequate supervision; recklessly and knowingly failing to provide adequate training; and recklessly failing to provide personnel to marshal the vehicle to and from the Aircraft despite knowledge of the dangerous consequences thereof.

34.    Defendants' gross negligence and recklessness caused plaintiff's Aircraft to sustain damage, necessitating repairs and removal of the Aircraft from service.

35.    As a direct and proximate cause of the negligence and recklessness of defendants, plaintiff BRITISH AIRWAYS has sustained monetary damages of at least Five Hundred Thousand Dollars ($500,000), including damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution in value of the Aircraft, loss of use of

6

the Aircraft, lost profits, and other special damages in an amount to be proven at trial and which

plaintiff has a right to recover in this action together with interest.

### THIRD CLAIM FOR RELIEF AS TO SIGNATURE ONLY
### (Contract)

36.    Plaintiff BRITISH AIRWAYS repeats, reiterates and realleges each and every

allegation contained in paragraphs 1 through 35 inclusive of the within Complaint with the same

force and effect as if herein set forth in full.

37.    In the "Into-Plane Fuel Service Agreement" between plaintiff and defendant

SIGNATURE, defendant SIGNATURE agreed, *inter alia*, that it would provide services in a

good and workmanlike manner; that only trained and competent personnel under defendant

SIGNATURE's sole direction would undertake to provide such services; that the services would

meet or exceed applicable governmental and airport rules, regulations, and requirements; that the

services were to be performed in a safe, orderly, workmanlike manner in accordance with all

applicable standards and practices as defined in BRITISH AIRWAYS' Fueling Manual; that all

precautions would be taken to prevent damage to BRITISH AIRWAYS' aircraft; and that current

safety precautions at the time and place of fueling would be followed.

38.    Defendant SIGNATURE failed, *inter alia*, to provide services in a good and

workmanlike manner; failed to provide trained and competent personnel under SIGNATURE's

sole direction to perform such services; failed to provide services that met or exceeded applicable

governmental and airport rules, regulations, and requirements; failed to perform services in a

safe, orderly, workmanlike manner in accordance with all applicable standards and practices as

defined in BRITISH AIRWAYS' Fueling Manual; failed to take all precautions to prevent

7

damage to BRITISH AIRWAYS' aircraft; and failed to comply with current safety precautions Logan International Airport on the morning of July 13, 2002.

39.    Defendant SIGNATURE's breach of its contractual obligations caused damage to the Aircraft, necessitating repairs and removal of the Aircraft from service.

40.    As a direct and proximate cause of defendant SIGNATURE's breach of contract, plaintiff BRITISH AIRWAYS has sustained monetary damages of at least Five Hundred Thousand Dollars ($500,000), including damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution in value of the Aircraft, loss of use of the Aircraft, lost profits, and other special damages in an amount to be proven at trial and which plaintiff has a right to recover in this action together with interest.

### FOURTH CLAIM FOR RELIEF AS TO SIGNATURE ONLY
#### (Express Warranty)

41.    Plaintiff BRITISH AIRWAYS repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 40 inclusive of the within Complaint with the same force and effect as if herein set forth in full.

42.    In the "Into-Plane Fuel Service Agreement" between plaintiff and defendant SIGNATURE, defendant SIGNATURE warranted, *inter alia*, that it would provide services in a good and workmanlike manner; that only trained and competent personnel under SIGNATURE's sole direction would undertake to provide such services; that the services would meet or exceed applicable governmental and airport rules, regulations, and requirements; that the services would be performed in a safe, orderly, workmanlike manner in accordance with all applicable standards and practices as defined in BRITISH AIRWAYS' Fueling Manual; that all precautions would be

8

taken to prevent damage to BRITISH AIRWAYS' aircraft; and that current safety precautions at the time and place of fueling would be followed.

43.    Defendant SIGNATURE failed, *inter alia*, to provide services in a good and workmanlike manner; failed to provide trained and competent personnel under SIGNATURE's sole direction to perform such services; failed to provide services that met or exceeded applicable governmental and airport rules, regulations, and requirements; failed to perform services in a safe, orderly, workmanlike manner in accordance with all applicable standards and practices as defined in BRITISH AIRWAYS' Fueling Manual; failed to take all precautions to prevent damage to BRITISH AIRWAYS' aircraft; and failed to comply with current safety precautions at Logan International Airport on the morning of July 13, 2002.

44.    Defendant SIGNATURE's breach of its express warranty caused damage to the Aircraft, necessitating repairs and removal of the Aircraft from service.

45.    As a direct and proximate cause of defendant SIGNATURE's breach of warranty, plaintiff BRITISH AIRWAYS has sustained monetary damages of at least Five Hundred Thousand Dollars ($500,000), including damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution in value of the Aircraft, loss of use of the Aircraft, lost profits, and other special damages in an amount to be proven at trial and which plaintiff has a right to recover in this action together with interest.

## FIFTH CLAIM FOR RELIEF AS TO SIGNATURE ONLY
### (Implied Warranty)

46.    Plaintiff BRITISH AIRWAYS repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 45 inclusive of the within Complaint with the same force and effect as if herein set forth in full.

9

47.    At the time plaintiff and defendant SIGNATURE entered into the "Into-Plane Fuel Service Agreement," plaintiff made known, and defendant SIGNATURE was aware of, the professional skills required for fueling large aircraft, and defendant SIGNATURE impliedly warranted to the plaintiff that it would employ only competent, trained, and properly licensed personnel to provide the required services, that these personnel would perform all fueling services in a professional and workmanlike manner and that these personnel would be provided with adequate support and assistance.

48.    Defendant SIGNATURE failed to provide competent, trained, and properly licensed personnel, failed to perform fueling services in a professional and workmanlike manner, and failed to provide adequate support and assistance to its personnel in the performance fueling services for the Aircraft as warranted.

49.    Defendant SIGNATURE's breach of its implied warranties caused damage to the Aircraft, necessitating repairs and removal of the Aircraft from service.

50.    As a direct and proximate cause of defendant SIGNATURE's breach of warranty, plaintiff BRITISH AIRWAYS has sustained monetary damages of at least Five Hundred Thousand Dollars ($500,000), including damages for repair and ferrying of the Aircraft, damages caused by the cancellation of BA Flight 238, diminution in value of the Aircraft, loss of use of the Aircraft, lost profits, and other special damages in an amount to be proven at trial and which plaintiff has a right to recover in this action together with interest.

## JURY DEMAND

Plaintiff demands trial by jury on all issues in this matter.

10

## REQUEST FOR RELIEF

WHEREFORE, plaintiff BRITISH AIRWAYS PLC prays for judgment against defendants, jointly and severally, awarding:

1.    Compensatory damages in a sum to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000);

2.    Pre-judgment interest; and

3.    An award to the plaintiff of the costs of suit and post-judgment interest, with respect to each and every claim for relief, and also an award to the plaintiff of the costs of suit, attorneys' fees, post-judgment interest and any other relief to which plaintiff may be entitled and which the Court deems just and proper.

Respectfully submitted,
CAMPBELL, CAMPBELL & EDWARDS

By: _Kathleen M. Guilfoyle_
Richard P. Campbell BBO#071600
Kathleen M. Guilfoyle BBO#546512
One Constitution Plaza
Boston, Massachusetts 02129
(617) 241-3000

\- and –

CONDON & FORSYTH LLP
Diane Westwood Wilson
Times Square Tower
7 Times Square
New York, New York 10036
Tel: (212) 490-9100
Fax: (212) 370-4453

Attorneys for Plaintiff
BRITISH AIRWAYS PLC

11

**<u>EXHIBIT 2</u>**

# EXHIBIT A

INTO-PLANE FUEL SERVICE AGREEMENT

between



RECEIVED

MAR – 1 1999

SIGNATURE FLIGHT SUPPORT

SIGNATURE FLIGHT SUPPORT CORPORATION
and its subsidiaries

and

BRITISH AIRWAYS PLC

covering

the locations set forth in the Schedules attached hereto

effective

June 1, 1993

INTO-PLANE FUEL SERVICE AGREEMENT

AGREEMENT made this 1st day of June, 1993, by and between BRITISH AIRWAYS PLC, with a mailing address of 820 Gessner Road, Suite 840, Houston, Texas 77024 ("Carrier") and SIGNATURE FLIGHT SUPPORT CORPORATION, a Delaware corporation, and its subsidiaries, with its principal offices at Signature Plaza, 201 South Orange Avenue, Suite 1100, Orlando, Florida 32801 ("Signature").

1.    Location and Services.   Carrier agrees to purchase from Signature, and Signature agrees to furnish Carrier all of Carrier's requirements for into-plane fueling services ("Services") as defined at the airport locations specified in the Schedules annexed to this Agreement (collectively, the "Airport"), according to the rates, terms, and conditions specified herein.

2.    Term.   This Agreement shall take effect June 1, 1993, and shall remain in effect, unless stated otherwise in any annexed Schedule of Charges, until canceled or amended by either party with thirty (30) days written notice to the other.  It is mutually agreed that the effective date for the rates and charges at each annexed Airport shall be that date which appears on the applicable Schedule of Charges with the rates remaining in effect until modified in accordance with the terms and conditions as set forth herein.  It is understood that the applicability of this Agreement is at all times predicated on Carrier's and Signature's continuing authority and/or discretion to operate at the Airport.

It is mutually agreed the terms and conditions of this Agreement, exclusive of intoplane fees, shall be applicable and considered binding upon all ad-hoc, diversion or otherwise unscheduled operations conducted by the Carrier at those Airports which do not routinely handle or receive Carrier's aircraft and which are not otherwise included in the Schedules annexed to this Agreement but, upon Carrier's specific notification, may be requested and/or required to perform fueling or other aircraft servicing duties.  Into-plane fees for such unscheduled operations shall be determined by applicable local Signature management.

It is further agreed between the parties that all provisions of this Agreement, inclusive of applicable pricing at each of the Airports annexed hereto, shall be applicable and binding upon the Carrier's subsidiary companies, with the Carrier and the Carrier's subsidiary companies hereinafter collectively referred to as the "Carrier".

2

3a.    Fuel Source, Facilities, and Services Defined ( For Airports With Fuel Farms Under the Direct Control of Signature).  The Services to be provided by Signature are generally described as the storage of Carrier's fuel and the subsequent delivery of such fuel into Carrier's aircraft at the Airport.  With specific reference to the Services to be furnished and received respectively, Signature and the Carrier acknowledge and represent the following terms and conditions:

A) The Services provided by Signature shall be performed in a good and workmanlike manner and shall be undertaken by trained and competent personnel directed solely by Signature.

B) Signature shall ensure that an adequate supply of mobile refueling equipment is properly maintained and available at all times to meet the operational requirements of the Carrier.

C) Signature shall be responsible for obtaining Turbine/Jet A Fuel (hereinafter, " Fuel ") from Carrier's designated Fuel supplier and making such Fuel available to the Carrier at designated times.

D) The selection of fuel suppliers shall remain the exclusive province of the Carrier at all times. Carrier shall be responsible for notifying Signature as soon as possible of a Fuel supplier change. Such notification shall be in writing.

E) Signature warrants that it shall maintain the fuel storage system (hereafter, " System ") into which Carrier's Fuel will be delivered, stored and inventoried in accordance with local, state and federal regulations and shall perform all regular and periodic quantity and quality control checks in accordance with Signature, Carrier and federal guidelines.

F) Signature shall be responsible for assuring that such Fuel is available for the Carrier's account in sufficient quantities to adequately service Carrier's aircraft prior to the required deliveries to the Carrier's aircraft.  In the event Fuel is not available in sufficient quantities to meet the requirements of the Carrier, Signature shall inform the Carrier as soon as possible.  Carrier shall advise Signature promptly and in writing of replacement Fuel supplier or Signature shall have the option of refusing deliveries to Carrier's aircraft commensurate with the depletion of Carrier's Fuel supply in the System unless such Fuel shortfall is the result of the negligence of Signature.

G) Signature shall ensure that all Fuel deliveries made to the System conform to meet ASTM D-1655 specifications with latest revisions and shall perform all required pre-acceptance testing of such Fuel in conjunction therewith. Signature shall refuse any Fuel delivery which does not meet such minimum specifications. Signature shall notify the Carrier as soon as possible should such rejection occur.

H) It is mutually agreed that any gain or loss of Carrier's Fuel, as calculated by Signature at the end of each calendar month, in excess of one quarter of one percent (0.25%) of the Carrier's thruput volume, shall be explained to the reasonable satisfaction of the Carrier on an annual basis. Signature shall not be liable for losses of Carrier's Fuel in excess of one-quarter of one percent (.25%) while the Fuel is in Signature's custody except and to the extent such loss(es) are caused solely by Signature's negligence or willful misconduct. Such acceptable losses shall include temperature correction, quality control procedures, evaporation and sumping.  It is further agreed that all gains or losses in excess of one quarter of one percent (0.25%) shall be shared proportionately on a monthly basis with all fuel inventory holders of Signature's System.

3

(I) Carrier acknowledges that its Fuel will be commingled with fuel of other carriers within the System. Signature warrants and represents all commingled Fuel shall meet the specifications set forth herein.

(J) For purposes of this Agreement, custody or control of Carrier's Fuel shall be deemed to have passed from Carrier to Signature upon transfer of the Fuel into Signature's System ( or Signature's mobile fueling equipment at those locations where Signature does not maintain, manage or otherwise control the System where Carrier's Fuel is stored). Transfer of custody and control of the Fuel from Signature to the Carrier shall be deemed to have passed at the wing of Carrier's aircraft.

K) Carrier shall have the right at all reasonable times to review and inspect any and all records and conduct any independent quality control testing to confirm Signature's System, refueling equipment and procedures are in accordance with the terms and conditions set forth herein and Carrier's prevailing standards.

L) The Carrier shall provide to Signature an up to date approved copy of all applicable Fueling Manuals. Applicable revisions to the Fueling Manual shall be supplied by the issuing party to Signature in a timely manner.

M) Carrier agrees to reimburse Signature for recovery of actual costs incurred as a result of initial or recurrent training of Signature personnel consistent with the requirements and mandates set forth by the Federal Aviation Administration and/or Carrier's Fueling Manual at the Airports incorporated within this Agreement.

N) The Carrier shall provide flight schedule changes to Signature in writing and with as much advance notice as is possible.

O) Upon receipt of Carrier's fuel loading slips from authorized representatives of the Carrier, specifying, in writing, (i) the Fuel and amounts required, (ii) the flight numbers of requested deliveries, and (iii) the aircraft numbers of the Carrier's aircraft to be serviced, Signature agrees that it shall deliver Fuel into Carrier's aircraft as promptly as practical, consistent with Carrier's operating schedule, provided, however, that the obligation of Signature to perform is contingent on the availability of Fuel from Carrier's supplier(s) and provided further that Signature shall not be liable for any claims, costs or liability for any failure on its part to perform if such failure results from causes beyond its reasonable control.

P) Signature agrees to adhere to Carrier's fuel specifications and technical requirements as set forth in Exhibit A attached hereto and incorporated herein to the extent such specifications and guidelines do not encroach upon or otherwise infringe, negate or violate any existing Airport or Federal Aviation Administration regulation or guideline.

3b.    Limitation of Signature's Responsibilities and Liabilities at Certain Airports.

Notwithstanding the responsibilities of Signature as set forth in Sub-Paragraph 3a, Carrier acknowledges and understands Signature's limited interaction, management and/or operational/inventory control of the System at those Airports so designated within the applicable

4

Schedule of Charges attached hereto. Carrier further acknowledges, cognizant of Signature's non-operator status of such designated Systems, under no circumstances shall Signature be held liable for operational, maintenance or Fuel quantity or quality deficiencies of same, and Carrier agrees to indemnify, save and hold harmless Signature, its officers, directors and employees, from and against any and all claims which may arise as a result of Signature's inability to access, operate and/or otherwise obtain Carrier's Fuel from such designated Systems.

Consistent with the preceding limitation and prevailing Airport operational parameters, Carrier shall, when or where applicable, maintain primary responsibility for procurement of Fuel from its selected supplier(s) and making such Fuel available to Signature at such Airports.

4.    Rates and Charges. Signature shall supply the Services to Carrier at the rates and charges specified in Schedule I. All rates and charges herein are quoted in U.S. Dollars. In addition, when Signature is charged by law or contract with collection of same, Carrier shall pay to Signature all applicable concession, storage, through-put or other fees imposed on said flights by the governing agency of the Airport, together with any sales, use, excise, or other taxes imposed by any governmental jurisdiction by virtue of said flights. Such payments shall be remitted in the same manner as payments for Services. This obligation shall not be construed to apply to any taxes paid by Signature on its net profits or on any fixed property rentals or property taxes imposed on Signature.

Carrier acknowledges that the rates set forth in Schedule I are based on the Carrier's flight schedule in place on the Schedule's effective date. Signature and Carrier reserve the right to request a renegotiation of the prevailing rates in the event of Carrier changing the flight schedule or aircraft type upon which the Schedule I rates are based.

5.    Payment. Signature shall periodically invoice Carrier for the fees for Services, taxes, and other charges due hereunder. Payments shall be made in accordance with the terms set forth in Schedule II.

If Signature determines that Carrier's credit worthiness is adversely changing, then Signature, upon thirty (30) days prior written notice to Carrier, shall have the right to request a change in payment terms. If Carrier and Signature cannot reach agreement on new payment terms within thirty (30) days thereafter, then Signature shall have the option of terminating the Agreement immediately.

In the event invoices are not paid by Carrier as set forth in Schedule II, Signature reserves the right to impose a late fee of one and one-half percent (1.5%) per month which shall be added to the amount due and owing to Signature.

6.    Standards.    The Services furnished by Signature hereunder shall meet or exceed applicable governmental and airport rules, regulations, and requirements and are to be performed in a safe, orderly and workmanlike manner in accordance with all applicable standards and practices as defined in the Carrier's Fueling Manual.

7.    Scheduling.    Signature agrees to provide into-plane fueling services to all scheduled flights by Carrier at the Airport and to use its best efforts to provide such services to any unscheduled flight by Carrier at the Airport.

8.    Priority.    In the case of multiple handling, Signature reserves the right to accord priority to aircraft operating on schedule.

9.    Emergencies.    In the event of emergencies related to the Services furnished herein, including but not limited to fuel spills, Signature shall without delay and without waiting for instructions from the Carrier undertake all reasonable steps to initiate corrective action consistent with Airport, State, Local and Federal guidelines. In such event, Carrier agrees to compensate Signature its reasonable charges for services rendered when determined such emergency situation was caused by Carrier's acts or omissions.

10.    Employment Insurance and Taxes.    Signature agrees that its personnel furnishing the Services to Carrier hereunder shall be covered by statutory workers' compensation insurance and shall be employees of Signature under the provisions of applicable local, state, or Federal unemployment compensation laws and other social security legislation, and further agrees to hold Carrier, its directors, officers, employees, agents and assigns harmless from any and all taxes, contributions, or assessments imposed pursuant to any such laws by virtue of such employment.

11.    Indemnification.    Signature agrees to fully indemnify, save and hold harmless Carrier, the Airport and their respective directors, officers, employees, agents and assigns from and against all claims and actions, including those arising from and in conjunction with fuel spills, and all expenses and fees incidental to the investigation and defense thereof, arising out of Signature's acts or omissions, or the acts or omissions of its directors, officers, employees, agents or assigns in connection with the

6

Services which are the subject of this Agreement, except where such claims or actions arise from the sole negligence or willful misconduct of the Carrier.

Carrier agrees to fully indemnify, save and hold harmless Signature, the Airport and their respective directors, officers, employees, agents and assigns from and against all claims and actions, including those arising from and in conjunction with fuel spills, and all expenses and fees incidental to investigation and defense thereof, arising out of Carrier's acts or omissions, or the act or omissions of its directors, officers, employees, agents or assigns in connection with this Agreement, except where such claims or actions arise from the sole negligence or willful misconduct of Signature.

The termination of this Agreement shall not affect any rights or obligations which shall have accrued prior to the effective date of such termination.

12.   Force Majeure. Neither Signature nor the Carrier shall be responsible for loss or injury due to strikes, riots, acts of God, legal action of public authorities, or which are due to actions or events which cannot reasonably be anticipated or avoided or which are beyond the control of either party, respectively.

13.   Insurance. Signature agrees that it will obtain and keep in full force and effect insurance coverage as set forth in Schedule II annexed hereto.

Carrier shall procure and keep in full force and effect "all risk" type hull insurance on the aircraft and engines, including the operation and maintenance of same.

Carrier and its insurers agree to waive their rights of subrogation in favor of Signature with respect to loss or damage resulting from the services to be performed by Signature hereunder, except where loss or damage results from the sole negligence or willful misconduct of Signature.

Carrier shall also procure and keep in full force and effect policies of aircraft and comprehensive general liability insurance with respect to its aircraft, operations, and maintenance.

The policies of Signature and the Carrier shall be endorsed to cover the indemnity and hold harmless obligations of Carrier to Signature and Signature to Carrier hereunder and shall contain customary clauses providing thirty (30) days written notice to either party of cancellation or modification. All such insurance shall be from insurers and in such amounts as are acceptable to both parties and shall name the respective opposite party and the Airport as additional insureds on liability

7

policies. Prior to the commencement of Services under this Agreement, Signature and Carrier shall furnish certificates to each other evidencing such insurance at the address set forth herein. Prior to the effective date of any modification or replacement of any such insurance, the affected party shall furnish certificates evidencing such modification or replacement to the other party.

Signature and the Carrier are named as additional insured on each other's insurance, but solely with respect to liability arising from each party's respective negligent acts or omissions in performance of this Agreement. Notwithstanding the foregoing Signature endorsement, Signature shall name Carrier as an additional insured under the insurance policies described herein, but the scope of coverage provided to Carrier shall be limited to coincide with Signature's obligation to indemnify, defend and hold harmless Carrier pursuant to the provisions of Paragraph 11, and shall be subject to all coverage limitations, exclusions, definitions, conditions, endorsements and other requirements, limitations and obligations set forth in Signature's insurance policies. Nothing contained in said policies shall be construed to expand the coverage provided to Carrier beyond the scope of Signature's obligation to defend, indemnify and hold harmless Carrier pursuant to the indemnity provisions of Paragraph 11.

THE PARTIES HEREBY AGREE THAT UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE), SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS. SIGNATURE AGREES TO ASSUME LIABILITY FOR ANY DIRECT DAMAGES CAUSED BY THE SOLE NEGLIGENCE OF ITS EMPLOYEES, DIRECTORS OR OFFICERS.

14.    Entire Agreement/Applicable Law.    This Agreement constitutes the entire Agreement of the parties and no modification, waiver, or change to this Agreement shall be effective unless in writing and executed by both parties hereto. This Agreement shall be binding on the parties and their respective successors and assigns and shall be governed by and construed in accordance with the laws of the State where the Services are performed.

15.    Assignment.    This Agreement is not assignable by either party and any attempts to procure and/or consummate such transactions shall be considered null and void.

8

16.    Independent Contractor.  Signature shall at all times act as an independent contractor and nothing contained herein shall be construed to create the relationship of employer and employee between the parties. It is mutually agreed and understood that all personnel engaged to perform the Services set forth in this Agreement are solely the employees and/or agents of Signature.

17.    Notices.  All notices to be given hereunder by either party shall be in writing and sent by U.S.Mail and/or facsimile addressed and/or transmitted to the other as follows:

a.    In the case of Signature to:

> Signature Flight Support Corporation
> Attention:  Corporate Contracts Manager
> Signature Plaza
> 201 South Orange Avenue, Suite 1100
> Orlando, Florida  32801

--and--

> Signature Flight Support Corporation
> Attention: General Manager

at the address set forth in each applicable Schedule I.

b.    In the case of the Carrier to:

> British Airways PLC
> 75-20 Astoria Boulevard
> Jackson Heights, New York 11370
> Attention:  U.S. Counsel

or at such other address as either party may designate to the other by written notice in the manner provided above.

9

SCHEDULE I-A-2
SCHEDULE OF CHARGES
Effective October 1, 1996 - September 30, 1997

| BRITISH AIRWAYS PLC | Baltimore-Washington International Airport (BWI) |
|---|---|

| AIRCRAFT | ALL |
|---|---|

| Into-Plane Fee (per scheduled flight) | $33.00 |
| Through-Put Fee (per gallon of Fuel delivered into the System) | $ 0.01 |
| Defueling Fee (per gallon) | $ 0.05 |
| Minimum Defueling Charge (per defuel request) | $150.00 |
| Aircraft Sumping Charge (per aircraft) | $ 5.00 |

NOTE 1: Signature IS the operator of the System at Baltimore-Washington International Airport.

NOTE 2: Exclude all applicable Airport concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Baltimore-Washington International Airport, Baltimore, Maryland shall be sent to the following address:

Signature Flight Support - Baltimore / Washington, Inc.
Attention: General Manager
Baltimore-Washington International Airport
P.O. Box 8786
Baltimore, Maryland  21240-9972

Signature Flight Support - Baltimore / Washington, Inc., a subsidiary of Signature Flight Support Corporation, and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993 for the period October 1, 1996 through September 30, 1997.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Baltimore-Washington International Airport.

By: _William L. Ackerman_

William L. Ackerman

Title: Vice President Fuel Purchasing and
Supply, North and Central America

By: _Kevin S. Worley_

Kevin S. Worley

Title:    Vice President – Airline Sales

SCHEDULE 1-A-3
SCHEDULE OF CHARGES
Effective October 1, 1997 - September 30, 1999

| BRITISH AIRWAYS PLC | Baltimore-Washington International Airport (BWI) |
|---|---|

| AIRCRAFT | ALL |
|---|---|

Into-Plane Fee (per gallon, all gallons, effective 10/1/97 - 9/30/98)     $ 0.0065

Into-Plane Fee (per gallon, all gallons, effective 10/1/98 - 9/30/99)     $ 0.01

Through-Put Fee (per gallon of Fuel delivered into the System)     $ 0.01
Defueling Fee (per gallon)     $ 0.05
Minimum Defueling Charge (per defuel request)     $150.00
Aircraft Sumping Charge (per aircraft)     $ 5.00

NOTE 1: Signature IS the operator of the System at Baltimore-Washington International Airport.

NOTE 2: Exclude all applicable Airport concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Baltimore-Washington International Airport, Baltimore, Maryland shall be sent to the following address:

      Signature Flight Support - Baltimore / Washington, Inc.
      Attention: General Manager
      Baltimore-Washington International Airport
      P.O. Box 8786
      Baltimore, Maryland 21240-9972

Signature Flight Support - Baltimore / Washington, Inc., a subsidiary of Signature Flight Support Corporation, and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993 for the period October 1, 1997 through September 30, 1999 and month to month thereafter.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Baltimore-Washington International Airport.

By: _____     By: _____
    William L. Ackerman              Kevin S. Worley

Title: Vice President Fuel Purchasing and     Title:    Vice President – Airline Sales
      Supply, North and Central America

SCHEDULE I-B-1
SCHEDULE OF CHARGES
Effective June 1, 1993 - May 31, 1996

BRITISH AIRWAYS PLC                                    Detroit Metropolitan Airport (DTW)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                                      **ALL**
AIRCRAFT
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

| | | |
|---|---|---|
| Into-Plane Fee (per gallon, via tanker delivery) | June 1, 1993 - May 31, 1994 | $ 0.0200 |
| | June 1, 1994 - May 31, 1995 | $ 0.0208 |
| | June 1, 1995 - May 31, 1996 | $ 0.0216 |

Defuel Fee (per gallon)                                          $ 0.05

Minimum Defuel Charge (per defuel service)              $150.00

NOTE 1: Signature IS the operator of the System at Detroit Metropolitan Airport.
NOTE 2: Excludes all applicable Airport concession fees and federal and state taxes.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Detroit Metropolitan Airport, Detroit, Michigan shall be sent to the following address:

> Signature Flight Support Corporation
> Attention: General Manager
> Detroit Metropolitan Airport
> Building #348
> Detroit, Michigan 48242-1497

Signature Flight Support Corporation and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993 for the period June 1, 1993 - May 31, 1996.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Detroit Metropolitan Airport.

By: _William L. Ackerman_        By: _Kevin S. Worley_

William L. Ackerman                              Kevin S. Worley

Title: Vice President Fuel Purchasing and        Title:    Vice President – Airline Sales
Supply, North and Central America

SCHEDULE I-B-2
SCHEDULE OF CHARGES
Effective June 1, 1996 - April 30, 1997

BRITISH AIRWAYS PLC                                   Detroit Metropolitan Airport (DTW)

AIRCRAFT                                                                          ALL

| | |
|---|---|
| Into-Plane Fee (per gallon, all gallons, via tanker delivery) | $ 0.0224 |
| Through-Put Fee (per gallon) | $ 0.0075 |
| Bonded Fuel Administration Fee (per gallon, for truck-deliveries only into Fuel storage) | $ 0.0055 |
| Defuel Fee (per gallon) | $ 0.05 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Signature IS the operator of the System at Detroit Metropolitan Airport.
NOTE 2: Excludes all applicable Airport concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Detroit Metropolitan Airport, Detroit, Michigan shall be sent to the following address:

Signature Flight Support Corporation
Attention: General Manager
Detroit Metropolitan Airport
Building #348
Detroit, Michigan 48242-1497

Signature Flight Support Corporation and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993, for the period June 1, 1996 - April 30, 1997.

Other-than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Detroit Metropolitan Airport.

BRITISH AIRWAYS PLC                        SIGNATURE FLIGHT SUPPORT
                                           CORPORATION

By: _____          By: _____
    William L. Ackerman                      Kevin S. Worley

Title: Vice President Fuel Purchasing and    Title:  Vice President — Airline Sales
       Supply, North and Central America

SCHEDULE 1-B-3
SCHEDULE OF CHARGES
Effective May 1, 1997 – May 31, 1999

| BRITISH AIRWAYS PLC | Detroit Metropolitan Airport (DTW) |
|---|---|
| | ALL |

**AIRCRAFT**

| | |
|---|---|
| Into-Plane Fee (per gallon, all gallons, via tanker delivery) | $ 0.02 |
| Defuel Fee (per gallon) | $ 0.05 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Excludes all applicable Airport concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Detroit Metropolitan Airport, Detroit, Michigan shall be sent to the following address:

> Signature Flight Support Corporation
> Attention: General Manager
> Detroit Metropolitan Airport
> Building #348
> Detroit, Michigan 48242-1497

Signature Flight Support Corporation and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993, for the period May 1, 1997 through May 31,1999 and month to month thereafter.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Detroit Metropolitan Airport.

BRITISH AIRWAYS PLC

By: _William L. Ackerman_

Title: Vice President Fuel Purchasing and Supply, North and Central America

SIGNATURE FLIGHT SUPPORT CORPORATION

By: _Kevin S. Worley_

Title: Vice President – Airline Sales

SCHEDULE I-D-1
SCHEDULE OF CHARGES
Effective August 1, 1993 - July 31, 1995

| BRITISH AIRWAYS PLC | Boston-Logan International Airport (BOS) |
|---|---|
| | **ALL** |
| AIRCRAFT | |

| | |
|---|---|
| Into-Plane Fee (per gallon, via hydrant delivery) | $  0.0290 |
| Into-Plane Fee (per gallon, via tanker delivery) | $  0.0334 |
| Through-Put Fee (per gallon) | $  0.0075 |
| Bonded Fuel Administration Fee (per gallon) | $  0.0055 |
| Defuel Fee (per gallon) | $  0.15 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Signature IS the operator of the System at Boston-Logan International Airport.

NOTE 2: Excludes all applicable Airport fees, concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Boston-Logan International Airport, Boston, Massachusetts shall be sent to the following address:

Signature Flight Support Corporation
Attention:  General Manager
Boston-Logan International Airport
60 Logan - South Harborside
East Boston, Massachusetts 02128

The Parties agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993, effective for the term August 1, 1993 through July 31, 1995.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Boston-Logan International Airport.

BRITISH AIRWAYS PLC

By:  _William L. Ackerman_
          William L. Ackerman

Title:  Vice President Fuel Purchasing and
          Supply, North and Central America

SIGNATURE FLIGHT SUPPORT
CORPORATION

By:  _Kevin S. Worley_
          Kevin S. Worley

Title:  Vice President – Airline Sales

SCHEDULE I-C-2
SCHEDULE OF CHARGES
Effective October 1, 1996 - September 30, 2000

BRITISH AIRWAYS PLC

Seattle-Tacoma International Airport (SEA)

ALL

AIRCRAFT

| | | |
|---|---|---|
| Into-Plane Fee (per gallon, via tanker delivery) October 1, 1996 - September 30, 1997 | | $0.0075 |
| October 1, 1997 - September 30, 2000 | | $0.0085 |
| Defuel Fee (per gallon) | | $  0.05 |
| Minimum Defuel Charge (per defuel service) | | $ 150.00 |

NOTE 1: Signature IS NOT the operator of the System at Seattle-Tacoma International Airport.

NOTE 2: Excludes all applicable Airport fees, concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Seattle-Tacoma International Airport, Seattle, Washington shall be sent to the following address:

Signature Flight Support - Seattle, Inc.
Attention: General Manager
Seattle-Tacoma International Airport
18740 Fillstand Road
Seattle, Washington 98158

Signature Flight Support - Seattle, Inc., a subsidiary of Signature Flight Support Corporation, and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993 for the period October 1, 1996 - September 30, 2000 and month to month thereafter.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Seattle-Tacoma International Airport.

BRITISH AIRWAYS PLC

By: _____
        William L. Ackerman

Title: Vice President Fuel Purchasing and
         Supply, North and Central America

SIGNATURE FLIGHT SUPPORT -
SEATTLE, INC.

By: _____
         Kevin S. Worley

Title:    Vice President – Airline Sales

SCHEDULE 1-D-2
SCHEDULE OF CHARGES
Effective August 1, 1995 – May 14, 1997

Boston-Logan International Airport (BOS)

BRITISH AIRWAYS PLC

| | ALL |
|---|---|
| AIRCRAFT | |
| Into-Plane Fee (per gallon, via hydrant delivery) | $ 0.0240 |
| Into-Plane Fee (per gallon, via tanker delivery) | $ 0.0284 |
| Through-Put Fee (per gallon) | $ 0.0075 |
| Bonded Fuel Administration Fee (per gallon) | $ 0.0055 |
| Defuel Fee (per gallon) | $ 0.05 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Signature IS the current operator of the System at Boston-Logan International Airport.
NOTE 2: Excludes all applicable Airport fees, concession fees and federal and state taxes.
NOTE 3: In the event the monthly gallonage deviates from the volume of Fuel required by the Carrier for the month of July, 1995 by a factor of plus or minus ten percent (10%) or more for three (3) consecutive months, both Signature and the Carrier (collectively, the "Parties") reserve the right to renegotiate the prevailing into-plane fee upon furnishing written notice of such intent.
NOTE 4: Signature agrees to be solely responsible for all costs incurred as a result of hydrant cart modifications necessary to service Carrier's Boeing 777 aircraft.
NOTE 5: Through-Put fees and Bonded Fuel Administration Fees to be billed through fuel supplier until further notice.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Boston-Logan International Airport, Boston, Massachusetts shall be sent to the following address:

Signature Flight Support Corporation
Attention: General Manager
Boston-Logan International Airport, 60 Logan - South Harborside
East Boston, Massachusetts 02128

The Parties agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993, effective for the term August 1, 1995 through May 14, 1997.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Boston-Logan International Airport.

BRITISH AIRWAYS PLC

By: _____
William L. Ackerman

Title: Vice President Fuel Purchasing and Supply, North and Central America

SIGNATURE FLIGHT SUPPORT CORP.

By: _____
Kevin S. Worley

Title:   Vice President – Airline Sales

SCHEDULE I-D-3
SCHEDULE OF CHARGES
Effective May 15, 1997 – July 31, 2000

BRITISH AIRWAYS PLC                                    Boston-Logan International Airport (BOS)

| AIRCRAFT | ALL |
|---|---|
| Into-Plane Fee (per gallon, via hydrant delivery) | $ 0.0200 |
| Into-Plane Fee (per gallon, via tanker delivery) | $ 0.0244 |
| Through-Put Fee (per gallon) | $ 0.01 |
| Bonded Fuel Administration Fee (per gallon) | $ 0.004675 |
| Defuel Fee (per gallon) | $ 0.05 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Signature IS the current operator of the System at Boston-Logan International Airport.

NOTE 2: Excludes all applicable Airport fees, concession fees and federal and state taxes.

NOTE 3: In the event the monthly gallonage deviates from the volume of Fuel required by the Carrier for the month of July, 1995 by a factor of plus or minus ten percent (10%) or more for three (3) consecutive months, both Signature and the Carrier (collectively, the "Parties") reserve the right to renegotiate the prevailing into-plane fee upon furnishing written notice of such intent.

NOTE 4: Through-Put fees and Bonded Fuel Administration Fees to be billed through fuel supplier until further notice.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Boston-Logan International Airport, Boston, Massachusetts shall be sent to the following address:

> Signature Flight Support Corporation
> Attention: General Manager
> Boston-Logan International Airport, 60 Logan - South Harborside
> East Boston, Massachusetts 02128

The Parties agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993, effective for the term May 15, 1997 through July 31, 2000.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Boston-Logan International Airport.

BRITISH AIRWAYS PLC                              SIGNATURE FLIGHT SUPPORT CORP.

By: _____              By: _____
          William L. Ackerman                              Kevin S. Worley

Title: Vice President Fuel Purchasing and          Title:    Vice President – Airline Sales
          Supply, North and Central America

SCHEDULE I-E-1
SCHEDULE OF CHARGES
Effective April 1, 1998 - March 31, 2001

| BRITISH AIRWAYS PLC | Charlotte-Douglas International Airport (CLT) |
| --- | --- |
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ALL |
| AIRCRAFT | |

| | |
| --- | --- |
| Into-Plane Fee (per gallon, via hydrant cart delivery) | $ 0.0085 |
| Thru-Put Fee (per gallon) | $ 0.007 |
| (This is a pass -through fee to the System Operator AGI.) | |
| Defuel Fee (per gallon) | $ 0.05 |
| Minimum Defuel Charge (per defuel service) | $150.00 |

NOTE 1: Signature IS NOT the operator of the System at Charlotte-Douglas International Airport.

NOTE 2: Excludes all applicable Airport fees, concession fees and federal and state taxes.

In accordance with Sub-Paragraph 17(a) of the Main Agreement, such notices for Charlotte-Douglas International Airport, Charlotte, North Carolina shall be sent to the following address:

Signature Flight Support - Charlotte, Inc.
Attention: General Manager
Charlotte-Douglas International Airport
5400 Airport Drive
Charlotte, North Carolina 28208

Signature Flight Support - Charlotte, Inc., a subsidiary of Signature Flight Support Corporation, and British Airways PLC (collectively, "the Parties") agree to the annexation of this Schedule of Charges to the Into-Plane Fuel Service Agreement (hereinafter, the "Main Agreement") dated June 1, 1993 for the period April 1, 1998 - March 31, 2001.

Other than the charges, terms, and conditions set forth above, the Parties agree that all terms and conditions of the Main Agreement shall be applicable to the Services performed and received at Charlotte-Douglas International Airport.

BRITISH AIRWAYS PLC

By: _____
Holly DeWitt-Vargas

Title: Coordinator Fuel Administration
North America

SIGNATURE FLIGHT SUPPORT -
CHARLOTTE, INC.

By: _____
Kevin S. Worley

Title: Vice President of Airlines Sales

EXHIBIT A

BRITISH AIRWAYS PLC
FUEL SPECIFICATION AND TECHNICAL REQUIREMENTS
ISSUE # 4 - EFFECTIVE DECEMBER 31, 1991

FUELING PROCEDURES AND EQUIPMENT REQUIREMENTS

2.1    Pressure fueling shall normally be used for servicing the Carrier's Aircraft ("Aircraft"). The maximum permitted Fuel pressure at the Aircraft couplings is 350 kN/ m2  (50 psi), unless instructed otherwise by the Carrier's representative.

2.3    Signature's fueling equipment shall be capable of delivering into any of the Aircraft any quantity of Fuel as may be required by the Carrier at a fueling rate compatible with the operational requirements of the Carrier.

If the Fuel being delivered to the Aircraft does not contain an approved anti-static dissipater additive, then the delivery flow rate must be restricted such that it does not exceed 350 U.S. Gallons per minute per refueling hose.

Signature will constantly liaise with the Carrier to ensure that, at all times, the capability and handling of fueling equipment is adequate to permit the entire fueling operation of each Aircraft-to be completed in a manner which shall not adversely affect the scheduled departure time for such Aircraft.

This does not in any way derogate from Signature's obligation to carry out any fueling as quickly as is practical with the fueling facilities available.

2.5    Signature shall ensure that all the equipment used for the services described in the Into-Plane Fuel Service Agreement attached hereto satisfies the Carrier's requirements with regards to safety and efficiency and is maintained in a safe, reliable and accurate condition.

2.6    All dispensing equipment for Fuel shall:

(a)    embody reliable delivery pressure control, capable of maintaining a steady and correct fuel pressure at the Aircraft couplings;

(b)    be so designed as to ensure that all Fuel passing through the "liters/Gallons Delivered" meter shall necessarily pass into the hoses connecting the dispenser and Aircraft; and

(c)    have each hose permanently identified. The maximum shelf storage life of these hoses should be two (2) years and the maximum overall life ten (10) years, both periods to be measured from date of manufacture.

2.7    Facilities shall be provided by Signature on each Airport incorporated within this Agreement which will be available to the Carrier on short notice for the purpose of undertaking defueling and load adjustment to the Aircraft for operational and engineering purposes. Signature's defueling capabilities must be of sufficient quality and capacity to fulfill the standard requirements of the Carrier. When load

adjustment is required, Signature shall utilize its best and most diligent efforts to effect an on-time departure of the Aircraft to the extent possible. Every precaution shall be taken by Signature to safeguard the identity and quality of Fuel defueled from and re-delivered to the Aircraft. Carrier agrees to take possession of defueled product with the next available Aircraft.

The maximum permitted suction at the Aircraft coupling during defueling operations of the Aircraft is minus 75 Kn/m2 (-11 psi) unless instructed otherwise by the Carrier's representative.

2.8    When requested by the Carrier, Signature shall provide a sampling of the Fuel being delivered to the Aircraft, drawn from the appropriate fueling equipment. When taking the aforementioned sample, the following must be observed:

(a)    Mobile Fueler - Prior to taking the sample from the fuel tank's lowest point, any associated pipework must be flushed.

(b)    Hydrant Dispenser - Any Fuel remaining from the previous fueling must be flushed through by delivering into the Aircraft a quantity of Fuel equal to that contained in the dispenser (approximately 1000 liters) and drain pipework must be flushed before taking the sample. On completion of fueling, a sample shall then be drawn from the microfilter or filter/separator sump.

The sample will be used by the Carrier for a cleanliness check, for which purpose Signature will have facilities readily available to perform a qualitative check, to determine the extent of bulk and suspended free water and particulate matter in the Fuel.

This shall include the provision of a Shell chemical water detector kit or other device acceptable to the Carrier, as well as a clean stainless steel bucket or appropriate size clean glass jar.

The sample will also be used, when appropriate, to enable the Carrier's operating crew to determine the density of the sampled Fuel. Upon completion of all testing, Carrier shall dispose of the sampled Fuel in a manner consistent with prevailing Airport, State and Federal regulations.

2.9    If at any time Fuel contamination is suspected, Signature shall cooperate by giving every assistance in ascertaining the cause and in rectifying the situation consistent with ensuring the highest standards of safety and minimizing any operational inconvenience. Signature shall do everything possible to retain evidence likely to prove useful in an investigation and shall, pending disposal instructions from the Carrier, retain adequate quantities of the Fuel removed from the Aircraft tanks and fueling equipment drains. If the cause of the contamination is determined not to lie with Signature's facilities and/or fueling equipment, all costs associated with disposal of the contaminated Fuel shall be ultimately borne by the Carrier.

2.10    Signature shall provide and dispatch, as necessary, any Fuel samples requested by the Carrier and such samples shall be analyzed in a laboratory, to be nominated by the Carrier, who shall be responsible for organizing such analyses as they see fit to request. For this purpose, Signature shall have Fuel sample containers with facilities for labeling readily available. All costs associated with fuel sampling and subsequent testing shall be ultimately borne by the Carrier, unless such sampling and testing is a result of the sole negligence of Signature.

2.11    The Carrier's representative(s), in conjunction and concert with Signature's representative(s), to inspect any  facilities of Signature at any time which are associated with the Services thereto performed under the terms and conditions of this Agreement.

2.12    The requirement for filtration is such that, during Aircraft fueling, all Fuel shall be subject to five (5) micrometer filtration or better.  Filter monitors should be used whenever practical on dispensing equipment.

2.13    Signature shall take all precautions necessary to prevent damage to Carrier's aircraft and property and injury to Carrier's personnel. To this end, Signature shall be responsible at all times during delivery and removal of Fuel for compliance with current safety precautions prevailing at the time and place of fueling.

    Signature's Fuel dispensing equipment, Fuel handling procedures, quality control standards and training of personnel, etc. shall be of the highest order and conform to the best current practice. All equipment, insofar as is reasonable to expect, shall be of the latest standard.

    The foregoing shall be in accordance with or comparable with the standards of good fueling practice set forth by such authorities as the UK Departments of Trade and Industry, US National Fire Protection Association (NFPA), Flight Safety Foundation, Aviation Technical Services Committee of the American Petroleum Institute and the Institute of Petroleum London.

2.14    In the event more than one (1) Fuel grade is available on an Airport, suitable mechanical safeguards, such as selective couplings, shall be utilized to ensure that only the correct grade of Fuel can be delivered to the Aircraft. The Fuel grade and equipment identification set out in API Bulletin 1542 is to be adopted. Failing this, the Carrier reserves the right to specify an alternative means of identification which can be readily observed and understood by ground and aircraft operating crews in addition to any other designations or codes already in use by Signature.

2.15    Signature shall also accept any reasonable, additional and technical requirements and safeguards of the Carrier.

2.16    Signature shall make available to the Carrier its complete Quality Control Manual and other relevant instructions relating to fuels and fueling procedures for scrutiny and acceptance. Any subsequent amendments to these documents shall be made available to the Carrier upon implementation.

2.17    Signature shall provide the Carrier, on request, a record of the range and average density at fifteen (15) degrees Celsius and net specific energy of the Fuel delivered to the Aircraft.

# **EXHIBIT 3**

## ASSIGNMENT AND CONSENT

THIS ASSIGNMENT AND CONSENT is made and entered into by and between SIGNATURE FLIGHT SUPPORT CORPORATION, ("SFS"), as assignor, and AIRCRAFT SERVICE INTERNATIONAL, INC. ("ASII"), as assignee effective as follows:

WHEREAS, SFS, entered into the Into-Plane Fuel Service Agreement with British Airways PLC ("Customer"), dated June 1, 1993 ("Agreement") ; and

WHEREAS, SFS performs into-plane fuel and related services ("Commercial Aviation Services") at various locations, including, but not limited to BWI, DTW, SEA, BOS, CLT, MCO and ANC under the terms of the Agreement; and

WHEREAS, SFS desires to assign to ASII its rights and duties to perform Commercial Aviation Services described under the Agreement; and

WHEREAS, ASII is willing to accept such assignment and to perform such Commercial Aviation Services described under the Agreement; and

WHEREAS, Customer is willing to grant its consent to such assignment of SFS's rights and duties under the Agreement.

NOW, THEREFORE, for and in consideration of the parties' mutual promises, SFS and ASII agree as follows:

1.    SFS herein assigns and transfers to ASII all of SFS's right, title and interest under the Agreement to perform Commercial Aviation Services to become effective when SFS obtains applicable airport approvals for the transfer of SFS's commercial line of business to ASII. Signature agrees to notify British Airways PLC at such times as those approvals are obtained; and

2.    ASII assumes all of the obligations of SFS required under the Agreement to perform Commercial Aviation Services; and

1

3.    ASII agrees to be bound by the terms and conditions of the Agreement; and

4.    Customer consents to SFS's transfer of Commercial Aviation Services to ASII.

IN WITNESS WHEREOF the parties have affixed their signature and caused this Assignment and Consent to be duly executed.

SIGNATURE FLIGHT
SUPPORT CORPORATION

ATTEST:

By: _____
Name: Douglas H. Crowther
Title: Vice President, Operations, General
       Aviation

WITNESS:
Donna M. Gill
Josephine A. Ottuzo

_____ day of _____ May _____, 2002

ATTEST:

AIRCRAFT SERVICE
INTERNATIONAL, INC.

By: _____
Name: Allen A. Pichon, Jr.
Title: Vice President, Operations

WITNESS:
Donna McGill
Josephine A. Ottuzo

_____ day of _____ May _____, 2002

ATTEST:

BRITISH AIRWAYS PLC

By: _____
Name: William L. Ackerman
Title: Vice President Fuel North and
       Central America

WITNESS:

06 day of _____ May _____, 2002

2

# **EXHIBIT 4**

ENTERED
ON
THE DOCKET

/CLOSED

FILED

MAY 29 2002

WILLIAM T. WALSH CLERK

By_____
(Deputy Clerk)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAY 2 4 2002

AT 8:30

WILLIAM T. WALSH
CLERK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SINGAPORE AIRLINES, LTD.,            :
                                     :
                    Plaintiff,       :
                                     :
            - against -              :
                                     :
SIGNATURE FLIGHT SUPPORT-NEW         :
JERSEY, INC.,                        :
                                     :
                    Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
01-1999 (DMC)

**STIPULATION AND ORDER
GRANTING DEFENDANT'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
ENTERING FINAL JUDGMENT**

THIS MATTER having come before the Court by defendant SIGNATURE

FLIGHT SUPPORT-NEW JERSEY, INC.'s ("SIGNATURE") motion for partial Summary

Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the Court having

considered the papers submitted and having heard oral argument, and for the reasons stated in the

record at oral argument on April 10, 2002, and the remaining claims herein resolved by

stipulation of the parties as to liability and the amount of damages,

It is on this _24_ day of May 2002,

ORDERED that defendant's motion is granted,

AND ORDERED that final judgment in the amount of $9,129.06, plus pre-

judgment interest at the rate of 5.5% per annum from April 25, 2001, be entered in favor of

plaintiff SINGAPORE AIRLINES, LTD. and against defendant SIGNATURE FLIGHT

SUPPORT-NEW JERSEY, INC.

I hereby consent to the form and entry of this Order for judgment:


DOMBROFF & GILMORE, P.C.

By

Ray Mariani

John R. Altieri

25 East Salem Street

P.O. Box 279

Hackensack, New Jersey 07602-0279

(201) 343-6525

Attorney for Plaintiff

SINGAPORE AIRLINES, LTD.

40 Broad Street, Suite 2000

New York, New York 10004

(212) 612-9550

Attorneys for Defendant

SIGNATURE FLIGHT SUPPORT-NEW

JERSEY, INC.


SO ORDERED:

DENNIS M. CAVANAUGH, U.S.D.J.

-2-

SIGNATUR.txt

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3
SINGAPORE AIRLINES,           :
4                        Civil Action
         Plaintiff,      :   No. 01-1999 (DMC)
5
      v.            :   TRANSCRIPT OF
6                        PROCEEDINGS
SIGNATURE FLIGHT SUPPORT,      :
7
      Defendant.        :
8  --------------------------------x

9                    Newark, New Jersey
                     April 10, 2002
10

11
BEFORE:
12
      THE HON. DENNIS M. CAVANAUGH, U.S.D.J.
13

14

15

16

17

18                    Reported by:
                     CHARLES P. McGUIRE, C.S.R.
19                    Official Court Reporter

20      Pursuant to Section 753, Title 28, United States
      Code, the following transcript is certified to be
21      an accurate record as taken stenographically in the

SIGNATUR.txt

above entitled proceedings.

22

23                    CHARLES P. McGUIRE, C.S.R.

24

25

2

1  APPEARANCES:

2       CONDON & FORSYTH, ESQS.
        685 Third Avenue
3        New York, New York 10007
        BY: JOHN R. ALTIERI, ESQ., and
4          BARTHOLOMEW BANINO, ESQ.,
        Attorneys for Plaintiff
5
        DOMBROFF & GILMORE, ESQS.
6        40 Broad Street
        New York, New York 10004
7        BY: RAYMOND L. MARIANI, ESQ.,
        And
8        HARRIS & GREENBERG, ESQS.
        1301 Main Street
9        Pleasantville, New Jersey 08232
        BY: FREDERICK P. WARNER, ESQ.,
10        Attorneys for Defendant

11

12

13

14

15

SIGNATUR.txt

16

17

18

19

20

21

22

23

24

25

3

1    THE COURT CLERK:  All rise.

2    THE COURT:  Be seated.

3    This is the matter of Singapore Airlines v.

4  Signature Flight Support, Civil Action Number 01-1999.

5    Can we get your appearances, please, counsel?

6    MR. ALTIERI:  John Altieri and Bartholomew Banino

7  of the firm of Condon & Forsyth.  Judge, we're for the

8  Plaintiff.

9    I'd like to have permission to have Mr. Banino, who

10  wrote the brief, argue in opposition to the motion.

SIGNATUR.txt

11    THE COURT:  Is he admitted here?

12    MR. ALTIERI:  He is admitted to the -- he is not.

13    THE COURT:  Any objection?

14    MR. WARNER:  No objection, Your Honor.

15    THE COURT:  Okay.  That's fair enough.

16    MR. ALTIERI:  Also, Judge, I'd like to thank you

17  for accommodating my schedule, as this was rescheduled at my

18  request.  Thank you.

19    THE COURT:  Mr. Altieri, we just live to

20  accommodate people's schedules.

21    (Laughter)

22    MR. ALTIERI:  Thank you.

23    THE COURT:  Counsel?

24    MR. WARNER:  Good morning, Your Honor.  I'm

25  Frederick Warner from the law office of Harris & Greenberg on


                                4

1  behalf of Defendant, and seated to my right is Raymond

2  Mariani, who has been admitted pro hac vice.

3    We would like to have Mr. Mariani, who wrote the

4 . brief on this matter, argue on behalf of Signature.


                            Page 4

SIGNATUR.txt

5      THE COURT: I assume there's no objection.

6      MR. ALTIERI: No objection.

7      THE COURT: Well, I've read the papers on this

8   matter.

9          Basically, this matter involves the issue of

10   whether or not we are dealing with direct and consequential

11   damages.

12          And the argument, as I understand it, on behalf of

13   Defendant, which is the company that does the ground work for

14   the cleaning and certain other aspects with respect to the

15   aircraft, apparently, when the steps were pushed up to the

16   aircraft in an effort to allow the employees their

17   opportunity to get on the plane to do their cleaning, or

18   whatever they had to do dealing with baggage, I forget what

19   it was, but it was a windy day, and apparently, the wind put

20   the portable stairway, which was on wheels, I believe, and

21   wasn't locked properly or some such thing, at least that's

22   the allegation, into the side of the aircraft, and it did

23   some damage to the aircraft.

24          I think the total amount of the damage, the

25   "direct," quote, damage right to the aircraft was something

SIGNATUR.txt

5

1    in the vicinity of $8,000.

2        Am I correct, counsel?

3        MR. MARIANI:  That's accurate, Your Honor.

4        THE COURT:  Okay.

5        And the Plaintiff Singapore takes the position that

6    the direct language that's in the contract between them and

7    Signature encompasses something more than merely that

8    accidental damage, but also some costs pertaining to having

9    to put some passengers up in hotels and costs that would

10   occur there, as well as I believe finding other flights on

11   other airlines for the various customers who were unable to

12   continue on the aircraft since the aircraft had to be taken

13   out of service to be fixed, to be repaired.

14       So the issue, as I understand it, comes down to

15   whether or not the Defendant should be or could be liable to

16   something beyond what they consider to be direct damages, and

17   the difference would be between some $8,000 and change and

18   some $200,000 and change.

19       I think that's what the case is all about.  Am I

20   correct?

21       MR. MARIANI:  You summarized it accurately, Your

Page 6

SIGNATUR.txt

22   Honor.

23       THE COURT:  Okay.  I'll hear you if you have

24   anything else to say.

25       MR. MARIANI:  Yes, Your Honor.


6

1       For the movant, Your Honor, with respect to the

2   wording in the contract itself, our position, Your Honor, is,

3   in terms of the plain wording of the contract, the exception

4   that's set forth in 9.2 under subsection (e), or direct loss

5   of or damage to property, including aircraft operated by the

6   carrier, including fire and all consequential damages, those

7   damages are then by operation of 9.2 removed from the

8   umbrella of 9.1 of things that would be encompassed within an

9   indemnity.  So 9.2 removes them.

10       In 9.3, if the parties wished, Your Honor, they

11   could have simply reinstated what was in 9.2(e), or they

12   could have chosen to strike what was in 9.2(e) and

13   effectively just take it out and never have it in there.

14       They didn't do that.  What they did is, in 9.3,

15   they reinstated under the umbrella of what is encompassed in

SIGNATUR.txt

16  9.1 for negligence, they reinstated a very limited wording,

17  which is, the direct loss of or damage.

18      So I think just based on the wording alone, the

19  parties, what they did was, they didn't strike out 9.2(e) or

20  copy the language of 9.2(e) down into 9.3; they did something

21  different.  They said, We're going to take a very tiny bit of

22  what has now been removed by 9.2(e) and we're going to

23  reinstate that down in 9.3.

24      So I think based on that wording alone, Your Honor,

25  the parties' intentions are clear.


7

1      Under the cases in our brief that this -- the

2  parties, what they have accomplished by way of this contract,

3  both big companies, equal bargaining strength, with all types

4  of, you know, lawyers, et cetera, on each side to bargain

5  this contract, it does not violate public policy in any way,

6  and it's quite reasonable because it does not go so far as to

7  completely exclude all liability.  To the contrary:  The

8  parties seem to be at pains to carve out their respective

9  liabilities.  So it would pass the three criteria that we've

10  laid out in the brief under the New Jersey cases.

SIGNATUR.txt

11        With respect to the arguments that this is really

12   -- doesn't go so far into all of the consequentials, what is

13   being looked at here --

14        THE COURT:  Yes, just so we're clear, the

15   Plaintiff's argument is, Look, we're not seeking everything

16   that could have been a potential consequence of this accident

17   -- they're attempting to limit those -- and it puts us into a

18   -- there are certain things that seem clearly direct and

19   clearly consequential, and then there seems to be this other

20   little group that's kind of the direct consequence of this.

21   And I think that's what they're seeking.

22        MR. MARIANI:  And I would submit to Your Honor that

23   it's a misnomer from their brief to say they're not seeking

24   loss of use, because then when you look at their list of

25   items they're seeking, which is at tab E to our brief, you


⌐
                                    8

1   can see the bulk of what they are looking for - namely, under

2   A, they're looking for $91,000 and change U. S. for putting

3   people on aircraft, and then under B, they're looking for,

4 . again, another 90,000 U. S.  About 75 percent of that under B

SIGNATUR.txt

5    is, again, for cost of transfer to other airlines.

6          So you're talking about 150,000 out of the 200,000

7    is for moving passengers. That's basically lose of use: We

8    couldn't use our aircraft; we had to move the passengers on

9    other aircraft. So they're looking for loss of use.

10         The one case that they cited -- they cite actually

11   two cases, Your Honor, and I only remarked on one in my reply

12   brief, and I apologize for that. The second case that they

13   cited is actually quite favorable to us, which is this

14   District of Kansas case, Carolina Products v. Learjet; it's a

15   late 2001 decision. And I'm using -- unfortunately, it's not

16   reported, Your Honor, so I'm using the Lexis citation. At

17   page 94 on the Lexis citation, the Court granted summary

18   judgment to Raytheon, the movant, on the point of loss of

19   use.

20         So counsel has cited that case for the principle

21   that it's a fact issue, that I must go to the jury.

22         To the contrary, the fact issue, Your Honor, was

23   only with respect to the issue of repairs to the aircraft.

24   As to the loss of use claim, the Court granted the summary

25   judgment to Raytheon and goes on at page 96 in a very, very

SIGNATUR.txt

9

1   good discussion to point out the distinction between

2   consequentials in tort and consequentials in contract, and

3   saying the consequentials in contract are much more

4   circumscribed than they are with respect to tort law, and

5   points out that distinction.

6          I have no other points, Your Honor, unless you have

7   any other questions.

8          THE COURT: No. I'm going to turn to the

9   Plaintiff.

10         MR. MARIANI: Thank you, Your Honor.

11         THE COURT: Thank you.

12         THE COURT: Counsel, I must admit I'm having

13   difficulty in agreeing with your argument in that what you're

14   saying to me, it seems to be, is that, Yes, we agree that

15   it's only direct, but this group of consequential damages

16   seem to fall within the direct-damage portion.

17         And it's like they either are or they're not. It

18   seems to me that this group of damages that you're pointing

19   to, or this category of damages, are consequential damages by

20   their very nature, by their definition.

SIGNATUR.txt

21      Let me tell you another thing that's concerning me

22   about this that neither side really brought up very much, but

23   in the whole theory of contracts between two parties,

24   shouldn't there be some amount of foreseeability as to what

25   the damages could be?  I mean, the damages, if allowed to be


C

                                    10

1   consequential in lieu of merely direct, could almost always

2   be open-ended.  I mean, theoretically, you could probably go

3   on and on as to the ripple effect of what would occur when a

4   plane is out of service.  And isn't that basically the whole

5   reason to have these types of contracts between two

6   sophisticated parties, two commercial parties such as this:

7   So that there is some finiteness as to the potential in a

8   damage situation as we have here?

9      MR. BANINO:  Your Honor, and I think you have just

10   argued's Plaintiff's argument, which is, everything other

11   than physical damages is consequential - everything.

12   Everything other than physical damages.

13      And yet there's nothing in the contract which says

14   that this is limited to physical damages.  It says direct --

15   it says direct --

SIGNATUR.txt

16    THE COURT: Why did we have all of this language in

17   9.2?

18    MR. BANINO: About consequential damages. We're

19   not alleging that we're looking for consequential damages. I

20   know that both the Court and Plaintiff believe that

21   everything other than physical damages is outside of direct

22   damages, but what we're saying is --

23    THE COURT: But it seems that the things you are

24   asking for -- at least, in my understanding of this, and I

25   used to do a fair amount of this type of work -- are what


                                    11

1   would be traditionally called consequential damages as a

2   result of the accident.

3    And as pointed out by counsel, in Exhibit E of the

4   papers, the hotel accommodations to put these people up, the

5   food; the delay in the plane: How would they not fall

6   outside of the contract?

7    MR. BANINO: What we're arguing is, let's take, for

8   example, these passengers who had paid $150 to travel on this

9   aircraft. This aircraft is out of service. This aircraft

Page 13

SIGNATUR.txt

10    was out of service for two weeks. We're not alleging that

11    future passengers who couldn't get onto this aircraft are

12    somehow compensable harm that Singapore should be responsible

13    for; we admit that's consequential damages. But when an

14    aircraft is put out of service, the immediate effect is, it

15    cannot leave that airport and take those passengers who have

16    paid Singapore money to be transported.

17          THE COURT: But the paying of Singapore the money

18    only goes to the fact that this is a, quote, potential loss

19    that Singapore may have, just as the other consequential

20    damages are losses. It's just another way of pointing to the

21    consequential damages, recognizing that it's more immediate

22    than necessarily something that occurred a week later, when

23    the plane was out of service and you have to do whatever the

24    company has to do when this happens, when a plane goes out of

25    service due to like an accident.


12

1          MR. BANINO: And that's precisely the point that

2    we're arguing is that it is an immediate injury. This is not

3    something that may have occurred; this is not something --

4          THE COURT: But immediately doesn't necessarily

Page 14

SIGNATUR.txt

5   bridge the gap between direct and consequential.

6          MR. BANINO: It's a direct loss. That's what we

7   are arguing.

8          And to give you an example of this, besides the

9   cases that we have mentioned, where courts have included this

10  accommodation of passengers --

11         THE COURT: I haven't found any courts under these

12  circumstances.

13         MR. BANINO: Well, the court in the Kuwait case,

            ———

14  and as we admit in our papers, it was stipulated beforehand,

15  that court recognized that the accommodating of passengers is

16  a different type of damage than this loss of use; that these

17  are two different types of damages. And the case which

18  Mr. Mariani just mentioned that we had brought up in our

19  papers, while we admit that the Court granted summary

20  judgment on the loss of use issue and consequential damages,

21  the Court also denied the motion for summary judgment on

22  precisely -- on I believe it's the rental costs and the extra

23  repair costs beyond the actual physical repair costs at the

24  initial event.

25         So we're not arguing that we're entitled to

Page 15

SIGNATUR.txt

13

1    consequential damages.  We're arguing that we're entitled to

2    direct and immediate damages.

3            THE COURT:  Right.  You're just saying that these

4    fall within that category.

5            MR. BANINO:  Absolutely.  And as an example of

6    this, although it's a different piece of legislation, the Air

7    Transport and Stabilization Act discusses direct damages, or

8    direct losses.

9            THE COURT:  Where is that in your papers?  What are

10   you talking about?

11           MR. BANINO:  It's not, Your Honor.  I just bring it

12   up --

13           THE COURT:  Well, what is this:  A surprise?

14           MR. BANINO:  I just bring it up as an example.

15           THE COURT:  Why wasn't it in your papers?

16           MR. BANINO:  Because I believe the legislation was

17   not enacted when the papers were submitted.

18           THE COURT:  All right.  What did you want to bring

19   up?

20           MR. BANINO:  Well, that the Government has mandated

Page 16

SIGNATUR.txt

21   that the airlines are entitled to recovery for direct losses.

22        Now, there was no physical damage to any of the

23   aircraft while these planes were out of service, while they

24   were grounded. But the Government recognized that this is a

25   direct loss, and in that direct loss, it's recovery for the


14

1   time that these aircraft are out of use.

2        THE COURT: So then why wouldn't you be claiming --

3        MR. BANINO: This is an example --

4        THE COURT: Then why wouldn't you be claiming that

5   you should have as direct damages the losses that you

6   incurred during the entire two-week period that the plane's

7   out of direct use?

8        MR. BANINO: Because, as I said, in another case,

9   it was recognized that loss of use is a different type of --

10   I mean, we would love to claim loss of use; but under the

11   case law as we see it, loss of use is recognized as a

12   different type of damage than accommodating passengers, and

13   based upon that, we're admitting that we're probably not

14   entitled to loss of use.

SIGNATUR.txt

15 What I'm saying here is that the Government has

16 recognized the direct loss encompasses more than just

17 physical damage.  I mean, there's nothing in this contract

18 that says anything about physical damage, which is what

19 Plaintiff's argument is, and there's no cases to support

20 physical damage as direct loss.  What we're arguing is the

21 immediacy of damages and the direct causation of damages.

22   THE COURT:  What was that you were just referring

23 to?

24   MR. BANINO:  I can provide Your Honor with a copy.

25   THE COURT:  Let me see that.


15

1 (A document was handed up to the Court.)

2 (Pause)

3   THE COURT:  Well, this is legislation that

4 apparently came out as a result of 9/11.

5   MR. BANINO:  Yes, Your Honor.

6   THE COURT:  And what it's trying to do from my

7 brief review of this is to try to give some relief to the

8 airlines due to the stop order that apparently was issued as

9 a result of the four planes being taken out of service as a

SIGNATUR.txt

10   result of that tragic incident.

11          MR. BANINO: Yes, Your Honor, and relief for loss

12   of revenue over the first entire quarter, financial quarter.

13   But that's --

14          THE COURT: Okay. But I think this legislation was

15   a specific attempt by our legislators to try to assist the

16   airlines in this horrendous event that obviously had nothing

17   to do with the airlines, or most of the airlines.

18          MR. BANINO: Yes. Yes, Your Honor. But what we

19   believe this shows is that direct loss is not limited to the

20   specific physical damages to an aircraft. This is just one

21   use of --

22          THE COURT: I don't know if it says that at all.

23   The section that you have outlined, that you have underlined

24   here says: "A, direct losses incurred beginning on September

25   11, 2001, by air carriers as a result of any Federal ground

16

1   stop order issued."

2          MR. BANINO: Yes, Your Honor; and as far as I know,

3   there were no physical damages to any of the aircraft that

SIGNATUR.txt

4    were stopped.

5         THE COURT: So your position would be because they

6    used the term "direct loss" that that could encompass direct

7    losses other than physical damage here.

8         MR. BANINO: Absolutely, and there are also -- I

9    mean, there are also calculations based on passenger traffic

10   and tonnage later on. I mean, I don't want to wear the Court

11   down to look through all of this, but the point is, it's not

12   just limited to physical damages. There's nothing in the

13   contract, there are no cases that Defendants have brought

14   forward which say anything about physical damages.

15        THE COURT: Let me ask the Defendant: What do you

16   say about that? Why shouldn't the airline be compensated for

17   that which is, quote, "direct," in their view the immediate

18   result of this accident?

19        They had a bunch of people standing around in an

20   airport, thinking they were getting on an airplane, and as a

21   result of your client putting a hole in the side of the

22   airplane, all of these people had to do something else. Why

23   wouldn't that be considered a direct result of the accident?

24        MR. MARIANI: The reason, Your Honor, is, then

25   basically there's no way to draw the line because there's no

Page 20

SIGNATUR.txt

17

1   difference between day one, which is when the accident

2   occurs, day two, and day 30.

3         THE COURT: No. Plaintiff says there is a

4   difference.

5         MR. MARIANI: And I'll point out why there isn't.

6          On day one, on this day, when these people can't

7   fly because the aircraft is damaged, under tab E, we see they

8   moved the people via other airlines at a cost of $150,000.

9   They moved them through other airlines. There are people

10   booked by their company to use other airlines. I'm sure

11   people reserve more than one day ahead. So what obviously

12   happened to those passengers, they have to rent an aircraft

13   or they fly them, once again, on somebody else's airline,

14   they repatriate them to another airline.

15         So what's the distinction between the day of the

16   accident and the next day? None at all. The event is the

17   same thing. There's people who are reserved; they wish to

18   travel; they have a contract with their airline, and they

19   have a right to get their ticket fulfilled, and so the

20   airline finds another means to travel. On this day, they put

SIGNATUR.txt

21    them on other airlines. The next day, the people who were

22    reserved for the day after, they may have put them on other

23    airlines again.

24        So to me, there's no distinction between those two

25    events.


18

1        THE COURT: How about the fact that they had to put

2    a bunch of people up in a hotel overnight as a result of the

3    actions of your client?

4        MR. MARIANI: Those seem to be the quintessential

5    consequential damages. That's exactly what consequential

6    damages are.

7        You can see also telephone calls. Passengers had

8    to make telephone calls; and I'm somebody that missed a

9    business meeting the next morning and lost $5,000 because of

10    that, so that passenger, he needs to recoup that money. It

11    goes on and on and on.

12        So this is why the parties in the contract are

13    quite clear they didn't get that word "consequential" in 9.2

14    and move it back into 9.3. They left it out.

SIGNATUR.txt

15      THE COURT: So is it your position, then, that the

16   only damages that can ever be in the category of direct

17   damages are physical damages to the airplane as a result of

18   an accident?

19      MR. MARIANI: Under this wording, exactly, Your

20   Honor.

21      THE COURT: So there could be no situation where

22   the direct damage could be anything but the physical damage;

23   it could not be anything against any passenger that's

24   injured.

25      MR. MARIANI: I was going to say, somebody was


19

1   struck by this --

2      THE COURT: Other than that.

3      MR. MARIANI: Other than that, they're

4   consequentials, Your Honor, they're all consequentials.

5   They're things that flow later on as a consequence.

6      THE COURT: Is there anything in the contract

7   between yourself and Singapore that specifically says that

8   direct damages are physical damages to the airplane and that

9   alone?

Page 23

SIGNATUR.txt

10        MR. MARIANI:  There is no definition key or

11    something to that.  I think the definition of those terms are

12    quite clear when you read the contract as a whole, reading

13    9.1, 9.2 and 9.3, which is what the New Jersey law requires

14    is to read the contract as a whole.  If we looked only -- if

15    I showed you just 9.3 by itself, and you never saw anything

16    else, perhaps the Court might be led down that road; but when

17    we look at the contract as a whole and see what the parties

18    did, in 9.1, liable for all negligence, 9.2, removing very

19    specific items, including consequential damages, and then in

20    9.3, reinstating only direct loss to the aircraft.

21        And again, as we put in our brief, Your Honor,

22    there's other words which we suggested in our brief that the

23    parties could have used if they wished.  The parties could

24    have said, under 9.3, direct loss or damage to the aircraft

25    and, you know, associated passenger revenues.  They could


                                20

1    have put other wording.  They didn't do that; they just kept

2    it to the aircraft itself.

3 .        And the fact that it says "to the aircraft" tells

SIGNATUR.txt

4   you: We're talking about the airplane; not talking about

5   passengers, what they lost, et cetera, just talking about the

6   airplane.

7        I'd like to -- in the Kuwait case, Your Honor, the

8   Court noted it, and counsel has brought it up, and again, I

9   see it, in the very first paragraph, this is a stipulation of

10  liability. It was never an issue for the Court to decide.

11  So even to the extent there's some nuggets there to look for,

12  it would be dictum.

13       THE COURT: I understand.

14       MR. MARIANI: With respect to the Aircraft

15  Stabilization Act, Your Honor, this is just a Congressional

16  act. As the Court knows, it was made to prop up the aviation

17  industry at a difficult time and is not any attempt to

18  construe contractual language of any type.

19       Thank you, Your Honor.

20       THE COURT: Thank you.

21       Anything further, counsel?

22       MR. BANINO: Yes, Your Honor.

23       I think counsel again argues our point that we're

24  not looking for consequential damages. He keeps using

25  consequential damages, and that's not what we're looking for.

Page 25

SIGNATUR.txt

21

1    I think as I mentioned in the papers, the simple

2   Black's Law Dictionary of consequential damages are those

3   damages which do not flow directly and immediately from an

4   injurious act. And we're alleging that these flowed directly

5   and immediately from an injurious act. If a ground handler

6   should somehow do something in an aircraft which does not

7   cause any physical damage but which causes the aircraft to be

8   put out of commission for that flight, is there no recovery

9   for the airline because there's no actual physical damage? I

10   can't imagine that the parties anticipated that there would

11   be no recovery if there's no physical damage. And that seems

12   to be their argument, although it's not supported by any

13   language either in the contract or in any case which says

14   that this is limited to physical damages.

15       To us, we're not seeking consequential damages.

16   We're seeking direct and immediate damages which flowed

17   directly from this type of incident, which courts have

18   recognized are different than, say, loss of use damages or

19   other damages, consequential damages which are further down

SIGNATUR.txt

20    the road.

21          THE COURT: Well, I think in addition to the

22    definition that you just read, there is also the definition

23    in Black's Law Dictionary: "Direct Loss" is "One resulting

24    immediately and proximately from the occurrence and not

25    remotely from some of the consequences or effects thereof."


                                22

1          MR. BANINO: Yes, Your Honor.

2          THE COURT: "Effects thereof."

3          MR. BANINO: Yes, Your Honor. And we argue that

4    these are immediate damages. This is the very next flight.

5    He argued, What are we to do about these passengers the next

6    day? Well, we're not worried about those passengers the next

7    day. Yes, they've made other reservations, but that, courts

8    have recognized, are different types of damages. We're not

9    seeking those types of damages. I don't believe we're

10    entitled to, as much as we'd like to seek them, we're not

11    entitled to those types of damages because loss of use is a

12    different type of damage.

13          THE COURT: Anything further?

14          MR. MARIANI: No, Your Honor. Thank you.

SIGNATUR.txt

15      THE COURT: I'm going to grant the motion.

16      I think upon reviewing this that these types of

17  damages are not direct damages. I think the agreement, when

18  it uses those terms, any direct loss of or damage to the

19  carrier's aircraft, while it maybe seems somewhat unfair

20  under the circumstances, I think that the Defendant, when

21  they made this contract, the idea of these direct damages was

22  the direct damage to the aircraft.

23      And, while I understand that the Plaintiff's

24  position is these things that have occurred are a result and

25  may be somewhat immediately or proximately involved in this

23

1  direct damage to the aircraft, they are, in my view,

2  consequential damages as a result of the direct damage to the

3  aircraft.

4      And, while it's unfortunate, I believe that two

5  sophisticated parties had every opportunity to contract as

6  they saw and deemed appropriate under the circumstances,

7  and they had every opportunity to change the language of

8  direct as to what it meant to the aircraft or to the

Page 28

SIGNATUR.txt

9    passengers as a result of that, and they didn't.

10         I think that the parties' meaning here was the

11   injury to the aircraft, and I believe that these other

12   damages are consequential, would fall outside the contract.

13         Accordingly, I'm going to grant the Defendant's

14   motion.

15         Submit an appropriate order.

16         MR. MARIANI:  Thank you, Your Honor.

17         MR. WARNER:  Thank you, Your Honor.

18         MR. ALTIERI:  Judge, we're not sure what the

19   damages are. It's a motion for partial summary judgment --

20         THE COURT:  Well, it would seem, as I understood

21   it, that the Defendant --

22         Do you argue the damages -- did you also take the

23   position that you weren't quite sure of the total amount of

24   what I now ruled are direct damages, that is, the damage to

25   the aircraft of the $8,107?


24

1         MR. BANINO:  Yes, Your Honor. As we understand it,

2    Plaintiffs have included two items, and I have not looked

3    through all of the items, but just cursory, I see that -- the

Page 29

SIGNATUR.txt

4    aircraft parking to do the repairs I would assume would fall

5    within repairs and physical damages.

6            THE COURT:  What is the Plaintiff's claim that

7    under my definition of direct damages the damages should be?

8            MR. BANINO:  My understanding from your ruling,

9    although I haven't seen any written order, is that it is

10   limited to --

11           THE COURT:  What I just said.

12           MR. BANINO:  -- repair costs --

13           THE COURT:  What do you believe the damage should

14   be?

15           MR. BANINO:  Well, repair costs and costs

16   associated with these repairs.

17           THE COURT:  Which is what?  How much?

18           MR. BANINO:  Oh.

19           It includes the engineering repairs mentioned by

20   Defendants before, probably the aircraft parking that goes

21   along with this, and it may involve, just looking at it, the

22   labor costs, the staff overtime cost --

23           THE COURT:  Here's what I'm going to do, counsel,

24   to be fair to you, since your argument is that it sounds like

25   you don't have these broken down just yet.  I'm going to

SIGNATUR.txt


25

1   allow you to submit to me your supplemental view as to what

2   you believe now, pursuant to my holding, just what you

3   believe these direct damages would be.

4        MR. BANINO:  Yes, Your Honor.

5        THE COURT:  Okay?

6        MR. ALTIERI:  It's not a lot of money.  It's just

7   categories.

8        THE COURT:  I just want to see what it is, and then

9   I'll determine what it is, and maybe then this case can be

10   resolved.

11        MR. MARIANI:  Do you want us to comment on that,

12   Your Honor?

13        THE COURT:  You will then respond to what they say.

14        MR. MARIANI:  Okay, Your Honor.

15        THE COURT:  Okay, gentlemen?

16        Thank you.

17   (Matter concluded)

18

19 .

SIGNATUR.txt

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
BRITISH AIRWAYS PLC,                      )      **CASE NO.: 05-11477(GAO)**
     Plaintiff                            )
                                          )
vs.                                       )
                                          )
SIGNATURE FLIGHT SUPPORT                  )
CORPORATION, and its subsidiaries         )
and AIRCRAFT SERVICE                      )
INTERNATIONAL GROUP, INC., and            )
its subsidiaries and/or affiliated        )
companies,                                )
     Defendants                           )
_____)

# CERTIFICATE OF SERVICE

     I, MICHAEL LUSHAN, Attorney for Defendants, Signature Flight Support Corporation and Aircraft Service International Group, Inc., hereby certify that on January 20, 2006, I electronically filed the foregoing Defendants' Motion for Partial Summary Judgment with the United States District Court for the District of Massachusetts using the CM/ECF System.  I served the foregoing document on the following CM/ECF participants:

          Richard P. Campbell, Esq., Attorney for Plaintiff
          Kathleen M. Guilfoyle, Esq., Attorney for Plaintiff

     I certify that I have mailed via First-Class Mail, postage prepaid, the documents electronically filed with the Court on the following non CM/ECF participants:

          Attorneys for the Plaintiff, British Airways PLC,
    Diane Westwood Wilson, Esq., Condon & Forsyth, LLP, Times Square Tower,
          7 Times Square, New York, NY  10036

               Defendants,
               By Its Attorneys,
               LUSHAN, McCARTHY & GOONAN

               /s/ Michael Lushan

              _____
              MICHAEL LUSHAN, ESQ.
              496 Harvard Street
              Brookline, MA  02446
              Tel:  (617) 739-0700
              BBO # 307990